2022 IL App (1st) 220083

FIFTH DIVISION
NOVEMBER 30, 2022

Nos. 1-22-0083)
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681) Cons.

| | |
|---|---|
| *In re* J.S., | ) Appeal from the |
|       Minor-Appellee, | ) Circuit Court of |
| | ) Cook County |
| | ) |
| | ) No. 09 JA 899 |
| | ) |
| | ) Appeal No. 1-22-0580 |
| | ) |
| (Marc D. Smith, Director of the Department of | ) Honorable |
| Children and Family Services, Contemnor-Appellant). | ) Patrick Murphy |
| | ) Judge Presiding. |

| | |
|---|---|
| *In re* A.C., | ) Appeal from the |
|       Minor-Appellee, | ) Circuit Court of |
| | ) Cook County |
| | ) |
| | ) No. 17 JA 1273 |
| | ) |
| | ) Appeal No. 1-22-0351 |
| | ) |
| (Marc D. Smith, Director of the Department of | ) Honorable |
| Children and Family Services, Contemnor-Appellant). | ) Patrick Murphy |
| | ) Judge Presiding. |

| | |
|---|---|
| *In re* R.A., | ) |
|       Minor-Appellee | ) Appeal from the |
| | ) Circuit Court of |
| | ) Cook County |
| | ) |

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

|  |  |
|---|---|
|  | )      No. 19 JA 1533 |
|  | ) |
|  | ) Appeal Nos. 1-22-0083 |
|  | )          1-22-0233 |
|  | ) |
| (Marc D. Smith, Director of the Department of | )      Honorable |
| Children and Family Services, Contemnor-Appellant). | )      Patrick Murphy |
|  | )      Judge Presiding. |

| | |
|---|---|
| *In re* C.J., | ) |
|      Minor-Appellee | )      Appeal from the |
|  | )      Circuit Court of |
|  | )      Cook County |
|  | ) |
|  | )      No. 20 JA 1532 |
|  | ) |
|  | ) Appeal Nos. 1-22-0399 |
|  | )          1-22-0540 |
|  | ) |
| (Marc D. Smith, Director of the Department of | )      Honorable |
| Children and Family Services, Contemnor-Appellant). | )      Patrick Murphy |
|  | )      Judge Presiding. |

| | |
|---|---|
| *In re* T.B., | )      Appeal from the |
|      Minor-Appellee, | )      Circuit Court of |
|  | )      Cook County |
|  | ) |
|  | )      No. 21 JA317 |
|  | ) |
|  | ) Appeal No. 1-22-0344 |
| (Marc D. Smith, Director of the Department of | )      Honorable |
| Children and Family Services, Contemnor-Appellant). | )      Patrick Murphy |

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)


|  | ) | Judge Presiding. |
|---|---|---|
| *In re* L.R.,<br>Minor-Appellee, | )<br>)<br>) | Appeal from the<br>Circuit Court of<br>Cook County |
|  | ) |  |
|  | ) | No. 21 JA 321 |
|  | ) |  |
|  | ) | Appeal No. 1-22-0681 |
|  | ) |  |
| (Marc D. Smith, Director of the Department of<br>Children and Family Services, Contemnor-Appellant). | )<br>)<br>) | Honorable<br>Patrick Murphy<br>Judge Presiding. |
| *In re* J.H.,<br>      Minor-Appellee, | )<br>)<br>) | Appeal from the<br>Circuit Court of<br>Cook County |
|  | ) |  |
|  | ) | No. 21 JA 808 |
|  | ) |  |
|  | ) | Appeal No. 1-22-0417 |
|  | ) |  |
| (Marc D. Smith, Director of the Department of<br>Children and Family Services, Contemnor-Appellant). | )<br>)<br>) | Honorable<br>Patrick Murphy<br>Judge Presiding. |
| *In re* J.C.,<br>      Minor-Appellee, | )<br>)<br>) | Appeal from the<br>Circuit Court of<br>Cook County |
|  | ) |  |
|  | ) | No. 21 JA 901 |
|  | ) |  |

3

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)


                                                        ) Appeal No. 1-22-0343
                                                        )
(Marc D. Smith, Director of the Department of           )        Honorable
Children and Family Services, Contemnor-Appellant;      )        Patrick Murphy
A.C.-A., Respondent-Appellee).                          )        Judge Presiding.

---

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Hoffman and Delort concurred in the judgment and opinion.

**OPINION**

¶ 1     This consolidated appeal of 10 cases arises from the circuit court of Cook County's

orders finding the appellant, Marc D. Smith, who is the director of the Department of Children and

Family Services (DCFS), in indirect civil contempt of court. The contempt finding was imposed

on Director Smith for not finding appropriate placements for each of the minors in question as

ordered by the trial court. This court granted motions to consolidate the cases on appeal because

of the similar fact patterns, arguments, and findings by the trial court in each of the cases. Each

case is directed against Director Smith in his official capacity. The Office of the Public Guardian

of Cook County filed petitions for rules to show cause on behalf of each of the minors in these

consolidated cases. The Office of the Public Guardian of Cook County asserted that Director Smith

and DCFS did not find appropriate placements for the minors in either a residential treatment

4

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

center[1] or a specialized foster home[2] as ordered by the trial court. After the issuance of a rule to show cause and a contempt hearing conducted by the trial court, the trial court found Director Smith in indirect civil contempt of court for failing to place each of the minors in appropriate placements as ordered by the court. As a result of the trial court's contempt finding, Director Smith was initially fined $1000 per day by the trial court. In order to purge the contempt finding and its consequences in each case, the trial court ordered that each minor in the specific case before the court be placed in an appropriate setting.

¶ 2        On appeal, Director Smith argues that the circuit court erred by (1) finding that he should be held in indirect civil contempt in each minor's case; (2) alternatively finding that the consent decree entered in *B.H. v. Smith*, 88-C-5599 (N.D. Ill. 1997), an unrelated case, did not bar the court from finding him in contempt; and (3) finding that the Integrated Care Center at Aunt Martha's (ICC) was not an appropriate placement for the minors in question and therefore did not

---

[1]A residential treatment center is a facility which offers counseling, medication management, and other services unique to an individual's needs. Some residential treatment centers are equipped to deal with minors of different ages, low IQ, or sexualized behavior.

[2]A specialized foster home is a foster home placement where the foster parent or parents are trained to deal with minors that have either low IQs, behavioral disorders, medical issues, or mental health disorders.

5

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

purge the contempt finding imposed upon him. For the following reasons, we reverse the judgments of the circuit court of Cook County.

¶ 3                                        BACKGROUND

¶ 4        We begin by providing some background information relevant to understanding the nature of the consolidated appeals before us. Prior to December 2021, the presiding judge of the circuit court of Cook County, child protection division, created a special court call, known as the "beyond medical necessity"[3] (BMN) call. The purpose of this new court call was to address the concerns of trial judges in the child protection division of the circuit court of Cook County regarding Cook County youth in the care of DCFS who remained in hospitals and residential treatment centers beyond their date of discharge and medical need. Any trial judge in the child protection division of the circuit court of Cook County is empowered to transfer cases, which they deem appropriate, to the BMN call.

¶ 5        Relevant to this appeal, the trial judge, who oversees the BMN call, entered specific orders regarding the appropriate placement of each of the individual minors in each of the cases on the BMN call. In each case, the minor was represented by the Office of the Public Guardian of

---

[3]"Beyond medical necessity" refers to being maintained in a psychiatric hospital or residential treatment center past the time that is therapeutically necessary or past the patient's discharge date.

6

Nos. 1-22-0083) Cons.
　　　1-22-0233)
　　　1-22-0343)
　　　1-22-0344)
　　　1-22-0351)
　　　1-22-0399)
　　　1-22-0417)
　　　1-22-0540)
　　　1-22-0580)
　　　1-22-0681)

Cook County, acting as guardian *ad litem* (GAL) for the individual minor. In the 10 individual cases that are consolidated in this appeal, the BMN trial court found that the minors were not placed in settings that the court considered appropriate within the meaning of the court's order or by the court-ordered deadlines. As a result, the GAL brought petitions for rules to show cause on behalf of each of the minors in question. The trial court granted each petition and issued the rules to show cause, after which hearings were held on each petition regarding whether Director Smith should be held in contempt. The hearings resulted in Director Smith being held in indirect civil contempt in each minor's case.

¶ 6　　　In laying out the contempt findings against Director Smith, the trial court went into great detail regarding the history, including various placements, of each minor before issuing the individual contempt finding. The trial court also made it clear that it was not basing its contempt finding on DCFS's or Director Smith's historically poor performance in handling the appropriate placement of minors. The trial court asserted that its contempt finding was based specifically on Director Smith disobeying the court's current orders by failing to find appropriate placement for the minors within the court-ordered parameters. Director Smith subsequently appealed each of the trial court's judgments.

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

¶ 7        On appeal, for purposes of efficiency and clarity, this court consolidated all 10 cases, which ultimately involve eight different minors. The relevant facts, as related to each minor individually and which led to the contempt finding in each of the consolidated cases, are outlined below.

¶ 8                    Appeal Nos. 1-22-0083 and 1-22-0233: *In re* R.A.

¶ 9        On December 20, 2019, the Cook County State's Attorney filed a petition for adjudication and wardship and a motion for temporary custody of the minor, R.A., who was 14 years old at the time of the petition. R.A.'s maternal grandmother, who was then providing care for R.A. and his two siblings, had developed dementia, and DCFS determined that the family was living in uninhabitable conditions due to the grandmother's medical condition. DCFS took temporary custody of R.A. and placed him with his aunt.

¶ 10        On August 26, 2020, DCFS recommended a residential treatment center as the most appropriate setting for R.A. In a clinical staffing[4] six months later, on February 23, 2021, DCFS again recommended a residential treatment center as the appropriate placement choice for R.A.

---

[4]A clinical staffing is a meeting between a DCFS's clinical staff, the minor's caseworker, and the minor's GAL to determine the most appropriate and least restrictive foster placement or setting to address the minor's needs.

8

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

During that time, R.A. ran away from his placement with his aunt multiple times, repeatedly returning to his grandmother's uninhabitable house, which, by that time, was condemned. On July 24, 2021, R.A. was transferred to Garfield Park Hospital, a psychiatric hospital, for psychiatric care after being found at his grandmother's condemned house once again. On October 6, 2021, the trial court conducted a permanency hearing,[5] during which it was established that R.A. was at Garfield Park Hospital "beyond medical necessity." DCFS recommended residential care for R.A., and the report from the Office of the Public Guardian of Cook County stated that Garfield Park Hospital determined that R.A. was beyond medical necessity for remaining at the hospital since September 10, 2021. On November 24, 2021, R.A.'s case was transferred to the BMN court call. On December 9, 2021, the BMN trial court ordered Director Smith to "immediately provide the recommended placement of residential care" to R.A. The court then continued the case for one week.

¶ 11      On December 16, 2021, the trial court conducted a status hearing for R.A. In the hearing, R.A.'s caseworker testified that R.A. had been referred to six different residential

---

[5]A permanency hearing is a hearing that occurs every 6 months, where the court determines whether a minor's placement is appropriate; whether services are being completed; and what long term placement goal should be ordered.

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

treatment centers but was denied admission to all due to his developmental delay. The caseworker testified that R.A. was incapable of being interviewed by potential facilities for appropriate placement. DCFS stated that it was unable to offer additional residential options for R.A. at that time. R.A. had been moved to eight different "placements," including five hospitalizations by the time of the hearing in question. After the hearing on December 16, 2021, the court issued an oral order that "[Director] Smith and his agents shall immediately provide the recommended placement of residential care" for R.A. The court then continued the case until December 30, 2021.

¶ 12      On December 28, 2021, the Office of the Public Guardian of Cook County filed a petition for a rule to show cause why Director Smith should not be held in indirect civil contempt of court for failing to comply with the December 9 and 16, 2021, orders to place R.A. in an appropriate residential treatment center. On January 6, 2022, the court held a hearing on the petition for a rule to show cause.

¶ 13      In the January 6, 2022, hearing, R.A.'s caseworker testified that R.A. has been ready for discharge since September 10, 2021, making his stay at the hospital beyond medical necessity for approximately 118 days. At the time of the hearing, DCFS had interviews scheduled for R.A. in the next seven days with two facilities, Children's Home Association of Illinois-Peoria (CHOP)

Nos. 1-22-0083) Cons.
       1-22-0233)
       1-22-0343)
       1-22-0344)
       1-22-0351)
       1-22-0399)
       1-22-0417)
       1-22-0540)
       1-22-0580)
       1-22-0681)

and Hoyleton Youth and Family Services (Hoyleton). The trial court issued the rule to show cause against Director Smith at the conclusion of the hearing. The case was then continued to January 13, 2022, for Director Smith to explain why he should not be held in contempt.

¶ 14      At the January 13, 2022, hearing, there was testimony by DCFS staff that R.A. was on the waitlist for CHOP and Hoyleton. DCFS was unsure of how long it would take to actually place R.A. at either facility.

¶ 15      The parties ended the hearing with a discussion of whether the consent decree entered in a prior, unrelated case, *B.H.*, 88-C-5599,[6] applied to R.A.'s situation and the court's ruling in his case. DCFS argued that if the court inquired into R.A.'s case in a manner that suggested it was looking into DCFS's systemic issues regarding the placement of minors, that would be beyond the scope of the trial court's power in this case. Further, it would conflict with the consent decree in *B.H.* R.A.'s GAL agreed with DCFS on this point. The GAL pointed out, however, that the relief

---

[6]*B.H.* is a federal case, where a group of DCFS minors on behalf of themselves and all minors in DCFS's care filed a class action lawsuit, alleging that DCFS shuffled minors between temporary placements, shelters, and psychiatric hospitals in violation of their federal statutory and due process rights. DCFS and the minors entered into a consent decree that specifically addressed DCFS's creation of placements and psychiatric hospitalization of youth in their care.

11

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

sought in this case was for the individual placement of R.A. and was not directed at the systemic problems of DCFS related to generally placing minors appropriately.

¶ 16      Director Smith argued that DCFS had done everything it could to place R.A. and faced many obstacles affecting appropriate placement, including staffing and COVID-19 pandemic related issues. The State suggested that the trial court defer its ruling on whether to find Director Smith in contempt until DCFS could determine the true availability of beds at the two facilities where R.A. was waitlisted. The GAL asked that Director Smith be held in contempt.

¶ 17      At the conclusion of the hearing, the court stated that it was aware of 150 minors in residential facilities state-wide being held beyond their discharge date and of 50 minors statewide hospitalized beyond medical necessity. The court acknowledged that, in R.A.'s case though, DCFS claimed to be doing the best it could because there was no available appropriate placement for him. The court then made an oral finding that it was holding Director Smith in indirect civil contempt for failing to appropriately place R.A. and implementing a fine of $1000 per day, effective January 18 at noon. Payment of the fine was stayed until January 20, 2022, at noon, though the accrual of the fine would begin on the effective date of the order. The trial court stated

12

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

that it would purge the contempt finding if R.A. was placed in an "appropriate facility." On January 13, 2022, the trial court reduced its oral finding to a written order.

¶ 18    In the January 13, 2022, written order, the court noted the systemic issues with DCFS, which affected minors across the state, but stated that the *specific* reason for the indirect civil contempt finding against Director Smith was DCFS'S failure to comply with the court's direct order to facilitate an appropriate residential placement for R.A. In its written order, the court noted that there were many cases involving minors being held at psychiatric hospitals beyond medical necessity. The court stated, "Director Smith can purge himself of the contempt by removing [R.A.] from the psychiatric hospital and placing him appropriately." On January 19, 2022, Director Smith filed a notice of appeal seeking to vacate the trial court's order finding him in indirect civil contempt in that case (appeal No. 1-22-0083).

¶ 19    In the interim, on January 27, 2022, the trial court conducted a status hearing regarding R.A.'s placement. In that hearing, the court was informed that R.A. had been placed in the ICC on January 21, 2022, and DCFS sought to purge the contempt finding against Director Smith based on this new placement of R.A. A DCFS caseworker's supervisor testified that the ICC was a temporary placement and that R.A. was on the waiting list at Hoyleton and CHOP. There was

13

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

additional testimony from DCFS staff regarding information related to the ICC. At the conclusion

of the hearing, the trial court stated that it wanted to "see" the ICC facility, and it would stay its

previously entered contempt finding against Director Smith until February 24, 2022. The trial court

did not purge the contempt order based on the newly revealed placement of R.A. at the ICC.

¶ 20       On February 8, 2022, Director Smith filed a notice of appeal in this case related to

R.A's placement at the ICC. He argued that the trial court erred by not purging the contempt

finding entered following its January 27, 2022, status hearing. In his notice of appeal, Director

Smith also asserted that the ICC was an appropriate placement for R.A (appeal No. 1-22-0233).

¶ 21                      Appeal No. 1-22-0343: *In re* J.C.

¶ 22       On September 28, 2021, the trial court granted temporary custody of the minor, J.C.,

to DCFS with the right to place her in an appropriate foster care setting. Temporary custody was

granted because of J.C.'s hospitalization at Hartgrove Hospital due to self-harming behavior and

threatening her adoptive mother with a knife. Her mother stated that she could not safely care for

J.C. in her home.

¶ 23        After DCFS's appointment as temporary custodian, J.C. was moved 24 times,

including 11 emergency room visits. During J.C.'s time in the emergency room, she was without

14

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

therapeutic services. During J.C.'s time in the custody of DCFS, the recommended level of care changed from specialized foster care in October 2021 to care in a residential treatment center for minors with developmental delays. Starting December 7, 2021, a day prior to the change in the recommendation, J.C. became ready for discharge from Lurie Children's Hospital. On December 17, 2021, the trial court transferred J.C.'s case to the BMN court call. On December 30, 2021, the judge overseeing the BMN court call ordered that DCFS remove J.C. from Lurie Children's Hospital by January 4, 2022, at 4 p.m. On January 6, 2022, the trial court ordered that "[Director] Smith must remove [J.C.] from [Lurie Childrens's Hospital] and place her in a clinically appropriate placement within 24 hours." On February 10, 2022, the trial court granted the GAL's petition for a rule to show cause for Director Smith's failure to comply with the trial court's January 6, 2022, order to find an appropriate placement for J.C.

¶ 24      On February 17, 2022, the trial court conducted a hearing on the petition for a rule to show cause why Director Smith should not be held in contempt. At the hearing, J.C.'s caseworker testified as to DCFS's efforts to find an appropriate placement for J.C., including that on December 3, 2021, the caseworker called five residential treatment centers and left voicemails for three of them. Two centers, Hephzibah Home (Hephzibah) and UCP Seguin of Greater Chicago, placed

15

Nos. 1-22-0083) Cons.
   1-22-0233)
   1-22-0343)
   1-22-0344)
   1-22-0351)
   1-22-0399)
   1-22-0417)
   1-22-0540)
   1-22-0580)
   1-22-0681)

J.C. on their waiting lists. The caseworker testified that, on December 17, 2021, DCFS recommended three residential treatment centers for J.C., Hoyleton; Nexus Indian Oaks Family Healing (Indian Oaks); and Genesee Lake School (Genesee). Genesee stated it could not accept J.C. due to her suicidal ideations, and Hoyleton stated it was unable to interview her until after January 4, 2022. The caseworker informed the court that J.C. was hospitalized again and that the new hospitalization was medically appropriate, as she was not ready for discharge. There was testimony as to J.C.'s history of sexual abuse, IQ of 57, and diagnosis of cerebral palsy. The trial court questioned the delay in DCFS's placement efforts given J.C.'s trauma and medical history. The trial court opined that it was apparent that a residential treatment center had been the most appropriate placement for J.C. all along.

¶ 25       At the conclusion of the hearing, the trial court held Director Smith in indirect civil contempt of court for violating its order to find appropriate placement for J.C. The court ruled that the contempt finding against Director Smith would go into effect when J.C. was ready for discharge from her current hospitalization. Director Smith would then be fined $1000 per day until J.C. was placed in an appropriate residential treatment center. The court reduced its oral finding to a written order. The court stated that, "[Director Smith] is being held in contempt of court for

16

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

ignoring the court's orders directing him to place the child appropriately." On February 28, 2022, J.C. became ready for discharge, but DCFS did not have an appropriate placement that was ready to accept her, so the contempt finding went into effect that day. The fines began accruing on March 1, 2022. On March 9, 2022, Director Smith filed his notice of appeal in this court, challenging the trial court's order finding him in contempt (appeal No. 1-22-0343).

¶ 26                    Appeal No. 1-22-0344: *In re* T.B.

¶ 27       On April 9, 2021, DCFS was made the temporary custodian of T.B. due to her eloping from her home and subsequently being hospitalized. T.B. had an extensive history of hospitalizations prior to coming into DCFS's care. Additionally, there were allegations that T.B. was born with fetal alcohol syndrome.

¶ 28       On February 3, 2022, the trial court on the BMN court call ordered that "[Director Smith] shall ensure that [T.B.] is placed appropriately by 3:15 p.m. on February 10, 2022." The clinical staffing for T.B. on February 8, 2022, recommended that T.B. be placed in a residential treatment center. On February 15, 2022, T.B.'s GAL filed a petition for a rule to show cause why DCFS should not be held in contempt for failing to comply with the court's order to place T.B. in an appropriate residential treatment center. On February 24, 2022, the court conducted a hearing

17

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

on the petition for a rule to show cause. T.B.'s caseworker testified that T.B., who was 11 years old at the time, had been psychiatrically hospitalized since April 2021 beyond medical necessity. The court heard testimony that Youth Villages in Barrington, Tennessee, was recommended as a potential residential treatment center for T.B. At the conclusion of the hearing, the court issued the rule to show cause against Director Smith.

¶ 29    On March 3, 2022, the trial court conducted a hearing on the rule to show cause why Director Smith should not be held in indirect civil contempt of court regarding the failure to appropriately place T.B. The DCFS area administrator testified that T.B. was matched with Little City and Hephzibah, but due to her level of functioning, both declined to accept her. T.B. also matched with Indian Oaks but was declined due to being too young. Five Star Industries, Inc., and Genesee declined to accept her due to her level of aggression. Hoyleton declined her a placement because she needed more intensive clinical services than they could provide. DCFS also looked at the possibility of moving T.B. to a diagnostic program with Hephzibah, but it was not a long-term residential treatment center. Additionally, that program has a cut-off at 12 years old, and T.B. turned 12 in October. At the time of the hearing, DCFS did not have any appropriate placement options that had accepted T.B. or even placed her on a waitlist. After the hearing, the trial court

18

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

held Director Smith in indirect civil contempt of court and fined DCFS $1000 per day until T.B. was placed appropriately. In its written order, the court stated that, "[Director Smith] is being held in contempt of court for ignoring the court's orders directing him to place the child appropriately." On March 9, 2022, Director Smith filed his notice of appeal (appeal No. 1-22-0344).

¶ 30                              Appeal No. 1-22-0351: *In re* A.C.

¶ 31        On December 11, 2017, the trial court granted temporary custody of A.C. to DCFS, due to A.C.'s mother getting into a physical altercation with her neighbor when A.C.'s mother was intoxicated. A.C.'s minor-brother attempted to intervene in the altercation and consequently received knife wounds to his scalp and hands. A.C. and her siblings were present during the incident. Following A.C.'s discharge from the Allendale residential treatment center in December 2020, the recommended placement was a specialized foster home. Since that time, though, A.C. had been moved six times. On January 27, 2022, the court entered an order to place A.C. appropriately within 14 days. On February 10, 2022, the BMN court again ordered DCFS to place A.C. in a clinically appropriate setting by 5 p.m. on February 20, 2022.

¶ 32        Prior to her involvement with DCFS, A.C. was a survivor of sexual abuse, which led to DCFS seeking a specialized foster home placement with no males in the home for her. Due to

19

Nos. 1-22-0083) Cons.
     1-22-0233)
     1-22-0343)
     1-22-0344)
     1-22-0351)
     1-22-0399)
     1-22-0417)
     1-22-0540)
     1-22-0580)
     1-22-0681)

the sexual abuse, intensive placement stabilization services[7] (IPS) recommended that A.C. receive trauma-focused therapy, beginning in December 2020 when she was released from Allendale. However, as of February 10, 2022, A.C. had not received trauma-focused therapy.

¶ 33    A.C. was at Allendale residential treatment center beyond medical necessity from March 2020 to December 2020. After her release, she was never enrolled in trauma-focused therapy, and DCFS stated that was because she was not in a stable placement for long enough. From December 2020 to June 2021, A.C. was in a stable placement environment with an 82-year-old foster mother. After she left that placement in June 2021, she was in two different placements over the next two months, with the last placement being disrupted due to allegations that A.C. was physically abused by the foster parent and inappropriately touched by the foster parent's child. Over the course of the nine months following A.C.'s release from Allendale, her therapist from Lutheran Children and Family Services, the agency which employed A.C.'s caseworker, never had contact with A.C. and no referrals were made for trauma-focused therapy. Shortly after A.C. was removed from the last placement, she was hospitalized for suicidal ideations.

---

[7]Intensive placement stabilization services are put in place to stabilize a placement for a minor.

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)


¶ 34       Following her hospitalization, A.C. was moved to her maternal aunt's home. DCFS

later discovered that A.C. had been previously placed in her aunt's home and had subsequently

been removed due to allegations of physical abuse of A.C. and her brother. A.C. later reported

that, during her second stint in her maternal aunt's home, she had been sleeping on a couch in the

basement and unauthorized people were living in the home without DCFS's knowledge. On

February 10, 2022, the trial court entered an order for A.C. to be placed in trauma-focused therapy

within 7 days. On February 24, 2022, she was placed on the waiting list for therapy with the

Advocate Trauma Treatment Center, which would provide inpatient treatment and serve as an

interim placement for A.C.

¶ 35       A.C.'s GAL filed a petition for a rule to show cause why Director Smith should not be

held in contempt. The trial court granted the petition, and on March 3, 2022, the court held a

hearing on the petition. The testimony regarding DCFS's efforts to find an appropriate placement

for A.C. established that she was placed at Streamwood Behavioral Hospital. The recommendation

was to place her in a specialized foster home following her hospital discharge. DCFS identified

Camelot; UCAN; Child Link; National Youth Advocate Program; Lutheran Children and Family

21

Nos. 1-22-0083) Cons.
     1-22-0233)
     1-22-0343)
     1-22-0344)
     1-22-0351)
     1-22-0399)
     1-22-0417)
     1-22-0540)
     1-22-0580)
     1-22-0681)

Services; and Children Above All as suitable agencies with specialized foster placements[8] for A.C. Only Camelot and Lutheran Children and Family Services interviewed A.C., but DCFS was still waiting to see if a foster parent with one of the other agencies was willing to accept her into their home. Initially, the plan was for A.C. to move in with her former Court Appointed Special Advocates (CASA) worker, as the CASA worker was willing to accept her into her home and become her guardian. However, the CASA worker moved to Minnesota during the pandemic. While she was living in Minnesota, A.C. had an extended stay visit with her. The CASA worker then moved to California, and DCFS was unsure if she was still a viable placement option for A.C.

¶ 36    At the conclusion of the hearing, the trial court entered an order finding Director Smith in indirect civil contempt of court for failing to appropriately place A.C. as ordered by the court. The court assessed a fine of $1000 per day against Director Smith, staying the payment of the fine until March 9, 2022. In the court's written order, it stated that, "[Director Smith] is being held in contempt of court for ignoring the court's orders directing him to place [A.C.] appropriately." On

_____

[8]The specialized foster placements considered for A.C. were matched through the foster parents contracted with each social services agency. In this system, DCFS reaches out to the agency, which meets the criteria for the minor, to see if any of the agency's foster parents are willing to interview the minor in question and accept the minor into their home.

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

March 9, 2022, Director Smith filed his notice of appeal, challenging the court's contempt finding (appeal No. 1-22-0351).

¶ 37                              Appeal Nos. 1-22-0399 and 1-22-0540: *In re* C.J.

¶ 38      On November 12, 2020, the trial court granted temporary custody of the minor, C.J., to DCFS for the purpose of appropriate placement, due to his untreated mental health issues as well as his substance abuse. Additionally, on November 10, 2022, C.J. and his father got into a physical altercation where his father held him down and choked him. C.J. ran away from the house after the confrontation and expressed suicidal ideations.

¶ 39      Since coming into DCFS's care in November 2020, C.J. had not been placed in an appropriate residential treatment center, which was the recommended level of care for him. He was instead placed at the ICC, a temporary placement facility, beginning in February 2021. C.J. has an IQ of 48. On March 31, 2021, the trial court ordered that C.J. be placed in an "appropriate residential placement within 30 days." On September 30, 2021, the trial court ordered DCFS to meet and discuss whether it was possible to add staff or services to Children's Home Association of Illinois, Hoyleton, and other residential treatment centers that had rejected C.J. to make the centers appropriate for C.J. On January 19, 2022, C.J.'s GAL filed a motion to compel appropriate

23

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

placement for C.J. since he had been placed at the ICC for nearly a year. On January 27, 2022, the BMN trial court ordered C.J. to be placed in a clinically appropriate setting by February 3, 2022. On February 23, 2022, C.J.'s GAL filed a petition for a rule to show cause why Director Smith should not be held in contempt for not complying with the placement order. The trial court issued the rule to show cause.

¶ 40       On March 17, 2022, the trial court conducted a hearing on whether Director Smith should be held in indirect civil contempt of court for not complying with the court's order to appropriately place C.J. DCFS's deputy director testified that C.J. was referred to Lawrence Hall; Center for Youth and Family Solutions; and Pavilion, all of which declined to accept him. C.J. was also referred to Allendale; Indian Oaks; TCI; Hoyleton; and Children's Home Association of Illinois, but he refused to interview with those residential treatment centers. At the time of the hearing, there were no other residential facilities based on his needs to which DCFS could refer C.J. Beginning in January 2022, because C.J. had been denied acceptance to residential treatment centers in Illinois, DCFS considered secure residential placements[9] outside the State of Illinois.

_____

[9]Secure residential placements or secure residential treatment centers are residential treatment centers with locked doors so the individuals within them cannot run away. The State of Illinois does not have any secure facilities. Secure facilities are typically recommended for minors with an extensive history of running away.

24

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

DCFS made referrals to six different residential facilities. Each residential treatment center declined to accept C.J. for various of reasons. DCFS's deputy director acknowledged that C.J. spent the majority of his time in DCFS's custody, except for a few months, residing at the ICC.

¶ 41       During the hearing, DCFS offered testimony regarding the various unsuccessful attempts it had made to place C.J. in an appropriate residential setting. C.J.'s GAL challenged DCFS regarding the effectiveness of its efforts. The court also asked questions of DCFS's witnesses and required more in-depth explanations of some of the responses.

¶ 42       DCFS's deputy director testified that DCFS had completed psychological exams on C.J. and was planning to do a substance abuse assessment to determine C.J.'s needs. Following those assessments, it would match C.J. with programs to address his needs.

¶ 43       C.J.'s caseworker testified that C.J. has a long history of running away. Additionally, C.J. had been uncooperative with interviews and that made it more difficult to place C.J. in an appropriate residential treatment center. Although the caseworker was not familiar with the specific specialized training of the ICC staff, where C.J. was temporarily housed, he opined that C.J. received similar services as if he was housed in a residential treatment center.

25

Nos. 1-22-0083) Cons.
  1-22-0233)
  1-22-0343)
  1-22-0344)
  1-22-0351)
  1-22-0399)
  1-22-0417)
  1-22-0540)
  1-22-0580)
  1-22-0681)

¶ 44  On March 17, 2022, the trial court entered an order finding Director Smith in indirect civil contempt for violating the court's March 21, 2021, order to place C.J. in an appropriate residential setting. The court assessed a fine of $1000 per day until C.J. was placed in an appropriate residential treatment center. In a written order, the trial court stated that, "[Director Smith] is being held in contempt of court for ignoring the court's orders directing him to place [C.J.] appropriately." On March 23, 2022, Director Smith filed his notice of appeal (appeal No. 1-22-0399).

¶ 45  On April 14, 2022, the trial court conducted a status hearing regarding C.J. Prior to the hearing, a child protection warrant was issued to locate C.J. since he ran away from his placement at the ICC. He was found two days later and taken to Comer Children's Hospital's emergency room, where he remained for two days. The following testimony took place at the hearing. While C.J. was being transported back to the ICC, he began to "get upset and fight" with the individuals transporting him. He was subsequently transported back to Comer Children's Hospital and released after a two-day hospitalization in the emergency room. DCFS then transported C.J. back to the ICC. He was later hospitalized at Saint Bernard Hospital, but after four days, on April 2, 2022, the hospital discharged him because it did not have an appropriate placement available for

26

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

him. The ICC declined to accept C.J. back, and he was housed at a DCFS office for three days. On April 5, 2022, he was placed at Lawrence Hall, from which he ran away that same night. He was subsequently placed there again. At the time of the hearing, on April 14, 2022, C.J. had run away from his placement again, and his whereabouts were then unknown.

¶ 46        The trial court noted that C.J. has an IQ of 48 and was held in a temporary placement for 14 or 15 months. It stated that it was not a surprise that C.J.'s behavior had deteriorated. The court expressed its displeasure with the amount of time DCFS had taken to find C.J. an appropriate placement. On April 14, 2022, the court entered an order increasing the fines for DCFS's failure to find appropriate placement for C.J. to $5000 per day. On April 20, 2022, Director Smith filed his notice appeal regarding the court's order increasing the amount of the fine (appeal No. 1-22-0540).

¶ 47                           Appeal No. 1-22-0417: *In re* J.H.

¶ 48        On September 2, 2021, the trial court appointed DCFS as the temporary custodian of J.H., who was 13 years old at the time. J.H. was brought into DCFS custody when her mother refused to pick her up from a psychiatric hospital at the conclusion of three months of psychiatric hospitalization.

27

Nos. 1-22-0083) Cons.
      1-22-0233)
      1-22-0343)
      1-22-0344)
      1-22-0351)
      1-22-0399)
      1-22-0417)
      1-22-0540)
      1-22-0580)
      1-22-0681)

¶ 49       Between November 4, 2021, and February 1, 2022, J.H. was moved 15 times, which included moves to foster homes, shelters, and emergency rooms. On February 3, 2022, the trial court on the BMN court call ordered DCFS to find an appropriate placement for J.H. by February 17, 2022. However, on February 17, 2022, she was placed in a DCFS shelter.

¶ 50       On February 23, 2022, J.H.'s GAL filed a petition for a rule to show cause why Director Smith should not be held in indirect civil contempt for failure to comply with the court's order to find appropriate placement for J.H. After a hearing on the petition, the court issued the rule to show cause. On March 24, 2022, the trial court conducted a hearing on whether Director Smith should be held in contempt of court for not placing J.H. in an appropriate residential facility. The court heard testimony that, although the placement recommendation for J.H. has been a residential treatment center, she had been in a shelter since March 15, 2022. DCFS had referred J.H. to six residential facilities, but none had accepted her.

¶ 51       On March 24, 2022, the trial court held Director Smith in indirect civil contempt of court for ignoring its orders to find an appropriate placement for J.H. The court-imposed fines of $1000 per day would continue until J.H. was appropriately placed. In its written order, the court stated that, "[Director Smith] is being held in contempt of court for ignoring the court's orders

28

Nos. 1-22-0083) Cons.
     1-22-0233)
     1-22-0343)
     1-22-0344)
     1-22-0351)
     1-22-0399)
     1-22-0417)
     1-22-0540)
     1-22-0580)
     1-22-0681)

directing him to place [J.H.] appropriately." On March 30, 2022, Director Smith filed his notice of appeal from the trial court's order (appeal No. 1-22-0417).

¶ 52                               Appeal No. 1-22-0580: *In re* J.S.

¶ 53      On October 16, 2009, the trial court appointed DCFS as the temporary custodian of J.S., when he was two years old. It was alleged that J.S.'s parents were not taking him and his siblings to medical appointments. Since coming into DCFS's care, J.S. had been in three different placements prior to a hospitalization at Garfield Park Hospital on September 7, 2021, because of hallucinations and violent behavior. J.S. was discharged from the hospital about a month later and was placed in a temporary foster home for a few weeks before he was hospitalized again in November 2021. On December 8, 2021, DCFS recommended that J.S. be placed in a residential treatment center. On January 30, 2022, J.S. was ready for discharge from his November 2021 hospitalization.

¶ 54      On March 9, 2022, the GAL for J.S. filed a motion to compel appropriate placement for J.S., since he had been hospitalized beyond medical necessity for over a month. The BMN trial court entered an order that appropriate placement be found for J.S. by March 25, 2022. The order

29

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

was entered *nunc pro tunc* to March 17, 2022. On March 31, 2022, the GAL for J.S. filed a petition for a rule to show cause, which the trial court issued.

¶ 55    On April 21, 2022, the trial court conducted a hearing on the rule to show cause as to why Director Smith should not be held in contempt. The acting deputy director of child services for DCFS testified that on January 16, 2022, J.S. was referred for placement with the Children's Home Association of Illinois; Hoyleton; Genesee; and Little City. However, Children's Home Association of Illinois; Genesee; and Little City denied J.S.'s referral due to his aggressive behaviors. On February 1, 2022, Hoyleton interviewed J.S. but declined the referral, citing staffing shortages. Additional referrals for J.S.'s placement were requested by DCFS on March 8, 2022. On April 7, 2022, out-of-state referrals were made by DCFS to Buckhorn Children and Family Services in Buckhorn, Kentucky, and Norris Academy in Andersonville, Tennessee. J.S.'s neuropsychological evaluation was completed earlier in the week of the hearing and would be used as a guide regarding what placements were appropriate for J.S.

¶ 56    On April 21, 2022, the court held Director Smith in indirect civil contempt for his failure to comply with the court's order to find appropriate placement for J.S. by March 25, 2022. The court issued fines of $1000 per day until appropriate placement was secured for J.S. On April

30

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

27, 2022, Director Smith filed his notice of appeal from the trial court's contempt finding (appeal No. 1-22-0580).

¶ 57                         Appeal No. 1-22-0681: *In re* L.R.

¶ 58        L.R. came into DCFS's care in Kansas, after being identified as a survivor of sex trafficking. She was placed with a permanent custodian, to which her parents consented. Subsequently, the permanent custodian admitted to hitting L.R., not allowing the school to assess her needs, and discontinuing her psychotropic medication. Around March 15, 2021, L.R. was hospitalized due to suicidal ideation and homicidal ideation toward her permanent custodian's wife and unborn child. L.R. has been diagnosed with post-traumatic stress disorder and cannabis use disorder. On April 8, 2021, DCFS was appointed as the temporary guardian of L.R.

¶ 59        On April 15, 2021, DCFS had a clinical staffing regarding L.R., which recommended specialized foster care for L.R. At that time, she was in Lurie Children's Hospital and had been ready for discharge since March 29, 2021. On July 18, 2021, L.R. was discharged and placed at the ICC. On September 17, 2021, the court determined that ICC was not a "necessary or appropriate" placement, but L.R. remained there until November 30, 2021, when she was moved to a specialized foster home. On January 14, 2022, she was placed in another temporary placement.

31

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

On February 3, 2022, another clinical staffing determined L.R.'s level of care had risen to residential treatment center care, and approximately two weeks later, she was hospitalized. She became ready for discharge on March 21, 2022. On April 19, 2022, DCFS started looking at options for secure out-of-state placement facilities for L.R., who was then 13 years old.

¶ 60        On March 25, 2022, the trial court had ordered DCFS to place L.R. in an appropriate placement by April 5, 2022. On April 14, 2022, the BMN trial court entered an order for L.R. to be appropriately placed by April 21, 2022. The order stated that if L.R. was not placed by that date, DCFS's deputy director was to create "an appropriate and individualized plan that will address placement and how the specialized needs of [L.R.] will be met." On April 21, 2022, the court entered an order, stating that, by May 12, 2022, DCFS was to provide L.R. with trauma-based therapy to address her sexual abuse. The GAL filed a petition for a rule to show cause for why Director Smith should not be held in contempt of court, which the trial court granted.

¶ 61        On May 12, 2022, the trial court conducted a hearing as to why Director Smith should not be held in contempt of court. During the hearing, the court heard testimony from DCFS staff that L.R. was referred to Allendale but it had declined to accept her due to her sexualized behavior. She was also referred to Pavilion and Indian Oaks, which both also declined to accept her.

32

Nos. 1-22-0083) Cons.
     1-22-0233)
     1-22-0343)
     1-22-0344)
     1-22-0351)
     1-22-0399)
     1-22-0417)
     1-22-0540)
     1-22-0580)
     1-22-0681)

Children's Home Association of Illinois declined to accept her due to her fire-setting behaviors. DCFS went back to Indian Oaks to see if there was a program that they could put in place to support L.R. but still Indian Oaks declined to accept her. Rite of Passage declined to accept L.R. due to her sexualized behavior. Cherish House declined to accept her due to staffing resource issues. The acting deputy DCFS director testified that there was a possibility of placing L.R. at a specialized foster home with DCFS providing appropriate resources needed to support L.R.

¶ 62        On May 12, 2022, the trial court entered an order finding Director Smith in indirect civil contempt of court due to his failure to comply with the order for appropriate placement of L.R. entered on April 14, 2022. Director Smith was fined $1000 per day starting on May 13, 2022. The payment of the fine was stayed until May 18, 2022. The court, in its written order, stated, "The federal government will not reimburse Illinois for hospitalizations beyond the date when the child should have been discharged." The order also asserted that "[the trial court] ordered [Director Smith] to appropriately place the child no later than April 21, 2022. This order was ignored." On May 16, 2022, Director Smith filed his notice of appeal of the trial court's order finding him in contempt (appeal No. 1-22-0681).

¶ 63                        Cases Consolidated on Appeal

33

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

¶ 64        On March 4, 2022, Director Smith filed a motion to consolidate appeal No. 1-22-0083

with appeal No. 1-22-0233, both of which involved R.A. This court granted Director Smith's

motion to consolidate. On April 20, 2022, this court, on its own motion consolidated appeal Nos.

1-22-0343 (J.C.), 1-22-0344 (T.B.), 1-22-0351 (A.C.), 1-22-0399 (C.J.), and 1-22-0417 (J.H.) with

appeal No. 1-22-0083, which had been previously consolidated on Director Smith's motion. On

May 24, 2022, this court granted Director Smith's motion to consolidate appeal No. 1-22-0540

(C.J.) with appeal No. 1-22-0083, the previously consolidated cases. On June 24, 2022, this court

granted Director Smith's motion to consolidate the remaining cases in this appeal, namely appeal

Nos. 1-22-0580 (J.S.) and 1-22-0681 (L.R.). Those cases were then consolidated with appeal No.

1-22-0083. Having summarized the relevant facts of each consolidated case individually, we now

turn to the merits of the cases as consolidated.

¶ 65                                    ANALYSIS

¶ 66        We note that we have jurisdiction to consider these cases individually and as a

consolidated matter. "An order finding a person or entity in contempt of court which imposes a

monetary or other penalty" vests jurisdiction in the appellate court (Ill. S. Ct. R. 304(b)(5) (eff.

Mar. 8, 2016)), and Director Smith filed timely notices of appeal following the trial court's

34

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

judgment holding him in indirect civil contempt in each case now before us. Ill. S. Ct. R. 303 (eff. July 1, 2017).

¶ 67        As an initial matter, we acknowledge Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which provides that, for an appeal involving the custody of a minor, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Director Smith filed his notice of appeal in the first case of this consolidated group of cases on January 19, 2022. Therefore, because this appeal involves the custody of minors, our order in this matter was due in June 2022. However, given the volume of cases with a similarity of issues, this court granted motions to consolidate the cases for a more efficient resolution of, what are in reality, multiple appeals. Both parties requested short extensions of time to file their briefs, and an *amicus curiae* brief in support of the minors-appellees was filed with leave of court by the American Civil Liberties Union of Illinois. Director Smith filed his reply brief on October 17, 2022, and shortly thereafter, on November 2, 2022, oral arguments were held on the consolidated appeals. Accordingly, there was good cause for the delay in the resolution and issuance of our order on these consolidated cases.

35

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

¶ 68    Turning to the merits of this appeal, Director Smith argues that the trial court erred by finding him in indirect civil contempt and not subsequently purging the contempt finding when some of the minors were placed in the ICC. Director Smith makes three central arguments. First, Director Smith argues that DCFS made a concerted effort to find appropriate placements for the minors when ordered to do so by the court but were unable to accomplish the necessary, appropriate placements within the time parameters set by the trial court. He asserts that he should not have been held in contempt given the obvious efforts made by DCFS to comply with the trial court's orders. Alternatively, Director Smith argues that the *B.H.* consent decree bars the trial court from entering a contempt finding in any of these cases based on the systemic failures of DCFS. Director Smith goes on to assert that the trial court's orders address systemic issues. Lastly, Director Smith also takes issue with the trial court's ruling that the ICC placement of some minors did not purge the contempt finding. He argues that the ICC placement should have purged the contempt findings for the minors in question. We first address the trial court's contempt finding.

¶ 69                              Contempt Finding

¶ 70    "A court is vested with inherent power to enforce its orders and preserve its dignity by the use of contempt proceedings." *People v. Warren*, 173 Ill. 2d 348, 368 (1996). The type of

36

Nos. 1-22-0083) Cons.
      1-22-0233)
      1-22-0343)
      1-22-0344)
      1-22-0351)
      1-22-0399)
      1-22-0417)
      1-22-0540)
      1-22-0580)
      1-22-0681)

contempt at issue in any given case determines the procedure that must be followed in a contempt proceeding. *In re A.M.*, 2020 IL App (4th) 190645, ¶ 13. Accordingly, contempt may be either direct or indirect and civil or criminal. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 49 (1990). "The existence of an order of the court and proof of willful disobedience of that order are essential to any finding of indirect contempt." *In re Marriage of Spent*, 342 Ill. App. 3d 643, 653 (2003). Indirect contempt "covers the entire range of [contumacious] conduct which does not occur in open court or in a constituent part of the court." *Betts*, 200 Ill. App. 3d at 48.

¶ 71    The primary factor in determining whether a contempt finding is civil or criminal in nature is "the purpose for which contempt sanctions are imposed." *Betts*, 200 Ill. App. 3d at 43. While the purpose of criminal contempt is to punish past misconduct, civil contempt is designed to be coercive in nature and "to compel the contemnor to perform a particular act." *Betts*, 200 Ill. App. 3d at 43. "Civil contempt proceedings have two fundamental attributes: (1) the contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order." *Betts*, 200 Ill. App. 3d at 44. A valid purge condition is a necessary part of an indirect civil contempt order, and "[a]

37

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

contemnor must be able to purge the civil contempt by doing that which the court has ordered him to do." *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007).

¶ 72    Initially, the burden falls on the petitioner in a rule to show cause to establish, by a preponderance of the evidence, that the alleged contemnor violated a court order and, therefore, should be held in contempt. *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50. "Noncompliance with a court order is *prima facie* evidence of contempt." *In re Marriage of Ray*, 2014 IL App (4th) 130326, ¶ 15. Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order. *Knoll*, 2016 IL App (1st) 152494, ¶ 50. "Contumacious conduct consists of conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court." (Internal quotation marks omitted.) *Knoll*, 2016 IL App (1st) 152494, ¶ 50. " 'Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion.' " *Knoll*, 2016 IL App (1st) 152494, ¶ 50 (quoting *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17). "A decision is against the manifest weight of the evidence where

38

Nos. 1-22-0083) Cons.
       1-22-0233)
       1-22-0343)
       1-22-0344)
       1-22-0351)
       1-22-0399)
       1-22-0417)
       1-22-0540)
       1-22-0580)
       1-22-0681)

the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotation marks omitted.) *Knoll*, 2016 IL App (1st) 152494, ¶ 50.

¶ 73       In the cases before us, there are no disputes amongst the parties that DCFS *did not comply* with the trial court's orders to place each of the minors in an appropriate residential treatment center or specialized foster home, based on the recommended level of care needed by the minor, by a date certain imposed by the court. Therefore, a *prima facie* case was made in each case that Director Smith did not comply with the trial court's orders. The parties dispute, however, whether Director Smith and DCFS were *unable*, through no fault of their own, to place each minor in an appropriate residential facility or foster home in accordance with the court's orders. Thus, the parties disagree regarding whether Director Smith met his burden of proving his *inability* to comply with the court's placement orders within the given time parameters.

¶ 74       Director Smith claims he made every possible effort to place the minors appropriately in accordance with the court's orders but circumstances beyond his and DCFS's control prevented the appropriate placements within the time mandated by the trial court's orders. For example, he cites the unwillingness of various residential treatment centers to take some of the minors, such as

39

Nos. 1-22-0083) Cons.
1-22-0233)
1-22-0343)
1-22-0344)
1-22-0351)
1-22-0399)
1-22-0417)
1-22-0540)
1-22-0580)
1-22-0681)

R.A. On the other hand, the GAL and the *amicus curiae* brief focus their arguments on various methods that were not employed by DCFS to secure appropriate placements for the minors in accordance with the trial court's orders. They argue vigorously that there were other avenues available to DCFS to secure appropriate placements for the minors, yet DCFS continued to employ ineffective methods that it should have known would fail.

¶ 75        Because we believe R.A.'s situation is illustrative of the main issues and arguments regarding whether DCFS and Director Smith's actions were willful and disregarded the trial court's order, we focus our analysis of this issue on R.A.'s particular situation. We note, also, that the trial court specifically found that Director Smith had "ignored' the trial court's orders in the majority of the cases in which the court made a contempt finding.

¶ 76        As is appropriate to evaluate the accuracy of the trial court's rulings, our review of the court's contempt findings focuses on the actions of DCFS and Director Smith *after* the date of entry of the court's orders relating to appropriate placement of the minors in question and before the date on which the trial court found Director Smith in indirect civil contempt. See *Betts*, 200 Ill. App. 3d at 43 (stating that unlike criminal contempt, civil contempt focuses only on actions taken after the order, with which the party did not comply, is entered). In R.A.'s case, the trial court

40

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

entered placement orders on December 9 and 16, 2021. At the contempt hearing in R.A.'s case, the court heard testimony from the foster care supervisor for R.A. That testimony showed that R.A. was *accepted* by two residential treatment centers but was waitlisted by them, as there were no available beds at that precise time. DCFS considered those as appropriate placements given the recommendation as well as R.A.'s needs. There was also testimony regarding the other efforts made by DCFS following the entry of the trial court's order for appropriate placement of R.A. Although the GAL and the *amicus curiae* brief argue that there were other measures that DCFS *could and should* have taken in order to ensure the appropriate placement of R.A. in accordance with the court order, that is not the criteria upon which we must resolve this appeal.

¶ 77      In the majority of these cases, the trial court found that Director Smith "ignored" the court's order. While the GAL and the court clearly disagreed with the methods used by DCFS to locate an appropriate placement, by the very acknowledgement of DCFS's ineffective methods, they are acknowledging that DCFS did not *ignore* the trial court's order. Thus, the question we must ask is not whether DCFS chose methods, which would have yielded an appropriate placement within the time prescribed by the court, but whether Director Smith "willfully ignored" the trial court's order thereby engaging in contumacious conduct.

41

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

¶ 78       As explained, the record shows that while DCFS's efforts were clearly ineffective, the trial court's orders were not ignored. Accordingly, the court's ruling that its orders were ignored, thereby resulting in a finding of indirect civil contempt by Director Smith, was erroneous.

¶ 79       The situation in R.A.'s case, including the initial court orders regarding appropriate placement, the activity of DCFS in response to the court's order, and the resulting finding of indirect civil contempt, is reflective of the majority of these consolidated cases. In each case, the trial court held Director Smith in indirect civil contempt while also acknowledging that DCFS was actively engaged in trying to find appropriate placements for the minors. At times, the court commented on the activity in which DCFS was engaged in trying to secure appropriate placements for the minors. The trial court, nonetheless, found that Director Smith was in contempt for failing to comply with the court's placement orders, opining that DCFS had "ignored" the trial court's orders. Such a ruling was inconsistent with the record. Further, it should be noted that R.A., like each of the minors in question, presented with very complicated histories, personal circumstances, and specific treatment plans. It was, therefore, appropriate for the trial court to address Director Smith's argument regarding whether he was *able* to comply with the trial court's orders. The trial court did not entertain any such consideration, however.

42

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

¶ 80      While we recognize that the court could reasonably have been frustrated by the pace of

Director Smith and DCFS in finding appropriate placements for the minors, the record belies the

trial court's written finding that Director Smith and DCFS "ignored" the court's orders. On the

contrary, the record bespeaks a great deal of activity by DCFS following each court order,

notwithstanding that the activity was, at times, seemingly inefficient and clearly ineffective.

Notwithstanding, that activity shows that DCFS made efforts to comply with the court's order to

place each minor by a date certain *prior to* the trial court's contempt finding. We note that in L.R.'s

case, for example, DCFS did follow up with a residential treatment center to offer services to make

the placement feasible for L.R. That residential treatment center still declined L.R., so that effort

was fruitless. Although the effort failed to amount to L.R. being appropriately placed, it cannot be

said that Director Smith "ignored" the trial court's order in that case as the court found in its

contempt ruling.

¶ 81      We realize, as did the trial court, the traumatic background of the minors in these cases

and the lengthy pendency of their individual cases. However, to the extent that the trial court

commented on the activity in which DCFS may have been engaged in *before* each court order was

entered, we reiterate that such activity and conduct by DCFS cannot be considered by the trial

43

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

court in its civil contempt ruling. The only activity that the trial court could consider in determining whether there was compliance with its orders was the activity of Director Smith and DCFS *after* the date of the entry of the court's orders for appropriate placement of each minor. Therefore, any arguments regarding how Director Smith and DCFS handled the placements of the minors before the placement orders are irrelevant to a finding of contempt in each of these consolidated cases.

¶ 82       This court is sympathetic to the trial court's enormous challenge in getting Director Smith and DCFS to seek appropriate and timely placement of these minors. We can discern that the trial court's frustration gave rise to using its coercive powers to seek a resolution of the ongoing failure of DCFS to find appropriate placements for these minors. Thus, it is understandable that the court grew weary with the seemingly ineffective methods employed by DCFS.

¶ 83       While it does not appear that DCFS and Director Smith demonstrated a sense of urgency to find appropriate placements for the minors, clearly some efforts were made. Although we do not condone DCFS's repetitive use of the same ineffective methods to place minors in these cases, we cannot say, in light of the record in each of these cases, that Director Smith *ignored* the trial court's orders to find appropriate placement for the minors. Further, the trial court gave no consideration to DCFS's ability to comply within the specified time imposed by the court. Given

44

Nos. 1-22-0083) Cons.
    1-22-0233)
    1-22-0343)
    1-22-0344)
    1-22-0351)
    1-22-0399)
    1-22-0417)
    1-22-0540)
    1-22-0580)
    1-22-0681)

the complexity of these cases, the resources available, and the time parameters imposed by the trial court, it would have been appropriate for the court to consider DCFS's argument regarding its inability to comply. Accordingly, we find that the trial court abused its discretion in entering findings of indirect civil contempt against Director Smith in each of these consolidated cases. See *Knoll*, 2016 IL App (1st) 152494, ¶ 50.

¶ 84    Nevertheless, although we acknowledge that DCFS and Director Smith *did* make some efforts to comply with the placement orders, those efforts fell woefully short of expectations. DCFS is tasked with providing for some of the state's most vulnerable youth, who present a wide range of significant challenges. The fact that some of the minors were hospitalized beyond medical necessity or left in inappropriate placements for months, or even over a year in some instances, is absolutely unacceptable. While the trial court erred in the methods it employed to coerce Director Smith into action in these cases, it is clear that the trial court was attempting to address a serious, widespread problem. We note that the trial court ultimately achieved its goal of having all the minors at issue placed in appropriate settings. Thus, the ultimate goal was achieved.

¶ 85    As we have found that the trial court abused its discretion by finding Director Smith in indirect civil contempt in all of these consolidated cases, we need not address whether the consent

45

Nos. 1-22-0083) Cons.
     1-22-0233)
     1-22-0343)
     1-22-0344)
     1-22-0351)
     1-22-0399)
     1-22-0417)
     1-22-0540)
     1-22-0580)
     1-22-0681)

decree in *B.H.* applies in these cases or whether the ICC is an appropriate placement for the minors in question under the contempt purge provision.

¶ 86                        CONCLUSION

¶ 87       For the foregoing reasons, we reverse the judgments of the circuit court of Cook County in each of the consolidated cases addressed in this opinion, except in appeal Nos. 1-22-0233 and 1-22-0540, where we vacate the judgments.

¶ 88       No. 1-22-0083, Reversed.

¶ 89       No. 1-22-0233, Vacated.

¶ 90       No. 1-22-0343, Reversed.

¶ 91       No. 1-22-0344, Reversed.

¶ 92       No. 1-22-0351, Reversed.

¶ 93       No. 1-22-0399, Reversed.

¶ 94       No. 1-22-0417, Reversed.

¶ 95       No. 1-22-0540, Vacated.

¶ 96       No. 1-22-0580, Reversed.

¶ 97       No. 1-22-0681, Reversed.

Nos. 1-22-0083) Cons.
     1-22-0233)
     1-22-0343)
     1-22-0344)
     1-22-0351)
     1-22-0399)
     1-22-0417)
     1-22-0540)
     1-22-0580)
     1-22-0681)

---

*In re R.A.*, 2022 IL App (1st) 220083

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-JA-1533; the Hon. Patrick Murphy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Christina T. Hansen, Assistant Attorney General, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), guardian *ad litem*. |

---

| | |
|---|---|
| **Attorney For Other Appellee:** | Thomas M. O'Connell, for appellee. |

---

| | |
|---|---|
| *Amicus Curiae***:** | Heidi Dalenberg, of Roger Baldwin Foundation of ACLU, Inc., of Chicago, for *amicus curiae* American Civil Liberties Union of Illinois. |